### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

IN RE: BANK OF AMERICA
WAGE AND HOUR EMPLOYMENT
LITIGATION                                     **Case No. 10-MD-2138-JWL**

**This Order Relates to All Cases**

### MEMORANDUM & ORDER

This multidistrict litigation proceeding consolidates numerous putative collective and class actions against Bank of America, N.A. and related entities ("the Bank") alleging that the Bank maintains a uniform, companywide policy and practice that requires its non-exempt employees to perform off-the-clock work in violation of federal and state wage and hour laws; and that, in violation of certain state laws, the Bank fails to provide meal and rest breaks; fails to timely compensate employees for all wages earned and vacation time accrued at termination; and fails to properly and accurately calculate overtime and report wages earned, hours worked and wage rates. Plaintiffs brought suit in various districts and the actions have been transferred to this court by the Judicial Panel on Multi-District Litigation for coordinated and consolidated pre-trial proceedings.

This matter is presently before the court on plaintiffs' motion for conditional certification of a nationwide FLSA collective action and for class certification of California and Washington state law claims pursuant to Federal Rule of Civil Procedure 23 (doc. 448). Specifically, plaintiffs move for certification of an FLSA collective action comprised of all non-exempt employees employed in the Bank's retail banking centers nationwide from October 19, 2006 to

the present; a California Rule 23 class comprised of all non-exempt employees employed in the Bank's retail banking centers in California from December 31, 2003 to the present; and a Washington Rule 23 class comprised of all non-exempt employees employed in the Bank's retail banking centers in Washington from September 15, 2006 to the present.[1]

For reasons discussed at length below, plaintiffs' motion is granted in part and denied in part. The court grants the motion with respect to the FLSA collective action, conditionally certifies the case as a collective action for purposes of sending notice of the action to putative class members, and makes further orders relating to the provision of notice to putative class members. The court denies the motion with respect to the Rule 23 classes. With respect to their off-the-clock and meal period claims, plaintiffs have not established that any common questions that might exist will predominate over the myriad of individual issues which these claims implicate. Certification of plaintiffs' rest period claims is denied because plaintiffs have not shown ascertainability of the class and have not demonstrated that any common contentions would predominate over individual issues. Certification of plaintiffs' vacation pay claims is denied on the grounds that plaintiffs have not shown the existence of common questions and have not shown that any common questions that might exist would predominate over individual issues. The court denies certification of plaintiffs' wage statement claims because plaintiffs have not shown a statutory injury. Finally, the court denies certification of plaintiffs' waiting

---

[1]     The consolidated complaint also asserts claims on behalf of the Bank's current and former call center employees. By agreement of the parties, a separate briefing schedule has been established for plaintiffs' motion to certify the call center claims and that motion, which is not yet ripe, will be resolved by separate order.

time claims for lack of typicality.  All other claims are derivative of plaintiffs' off-the-clock claims and are denied accordingly.

## I.     Standards for Collective Action and Class Certification

Resolution of plaintiffs' motion requires the application of two separate and distinct certification standards—one under § 216(b) of the FLSA and the other under Federal Rule of Civil Procedure 23.  *See Thiessen v. General Elec. Cap. Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (adopting "ad hoc" approach to certification under 216(b) because "it is not tied to the Rule 23 standards"); *Burkhart-Deal v. CitiFinancial, Inc.*, 2010 WL 457127, at *1 n.1 (W.D. Pa. Feb. 4, 2010).  As explained below, the certification standard under Rule 23 is clearly much higher than the standard for the sending of notice pursuant to § 216(b) of the FLSA.  *See Myers v. Hertz Corp.*, 624 F.3d 537, 556 (2d Cir. 2010); *Winfield v. CitiBank, N.A.*, 843 F. Supp. 2d 397, 409 (S.D.N.Y. 2012) ("[T]he stringent requirements for class certification under Rule 23 are not identical to the minimal burden that plaintiffs carry on a motion for conditional certification under 216(b) of the FLSA.").  Applying these different standards, the court grants conditional certification of the FLSA collective action for purposes of sending notice of the action to putative class members but denies certification of both proposed Rule 23 classes.[2]

*A.     Section 216(b) Certification*

---

[2]     Of course, only plaintiffs' off-the-clock claims are analyzed under the two distinct standards.  The remainder of plaintiffs' claims are analyzed only under state law and the Rule 23 certification standards.

Section 216(b) of the FLSA provides for an opt-in class action on behalf of employees who are "similarly situated" to the plaintiffs.  *See* 29 U.S.C. § 216(b).  The Tenth Circuit has approved a two-step approach in determining whether plaintiffs are "similarly situated" for purposes of § 216(b).  *See Thiessen*, 267 F.3d at 1105.  Under this approach, a court typically makes an initial "notice stage" determination of whether plaintiffs are similarly situated.  *See id.* at 1102 (citing *Vaszlavik v. Storage Tech. Corp*., 175 F.R.D. 672, 678 (D. Colo. 19*97))*.  That is, the court determines whether a collective action should be certified for purposes of sending notice of the action to potential class members.  *See Mooney v. Aramco Servs. Co*., 54 F.3d 1207, 1213–14 (5th Cir. 1995); *Zavala v. Wal Mart Stores Inc*., ___ F.3d ___, 2012 WL 3217522, at *6 (3rd Cir. Aug. 9,* 2012) ("conditional certification" is "not really a certification," it is simply the exercise of a district court's discretionary power to facilitate the sending of notice).  For conditional certification at the "notice stage," the court "require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  *See Thiessen*, 267 F.3d at 1102 (quoting *Vaszlavik, 175 F.R.D.* at 678).  The standard for certification at the notice stage, then, is a lenient one.  *See id.* at 1103. Indeed, the standard of proof at this stage typically results in certification.  *See Young v. Dollar Tree Stores, Inc*., 2012 WL 3705005, at *1 (D. Colo. Aug. 24,* 2012).

At the conclusion of discovery, the court then revisits the certification issue and makes a second determination (often prompted by a motion to decertify) of whether the plaintiffs are similarly situated using a stricter standard.  *Id.* at 1102–03.  During this "second stage" analysis, the court reviews several factors, including the disparate factual and employment settings of the individual plaintiffs, the various defenses available to defendant that appear to be individual to

4

each plaintiff, and fairness and procedural considerations.  *Id.* at 1103*; accord Zavala*, ___ F.3d ___, 2012 WL 3217522, at *2 (to certify collective action for trial at final certification stage, district court must make factual findings that members are similarly situated).  Of course, the fact that a collective action has been conditionally certified for purposes of sending notice does not mean that the court will reach the final certification question in all cases.  *See Apsley v. Boeing Co.*, ___ F.3d ___, 2012 WL 3642800 (10th Cir. Aug. 27, 2012) (affirming district court's decision granting summary judgment in favor of defendant on plaintiffs' collective action claim for pattern and practice of age discrimination and denying decertification motion as moot).

In their motion, plaintiffs specifically seek only "notice stage" certification of their FLSA collective action claims.  The Bank contends that it is absurd to apply that standard here in light of the substantial certification discovery that has occurred.  Indeed, the Bank contends that the court should apply the final certification standard here, noting that *Thiessen* suggests that the strict analysis reserved for final certification did not need to wait for the filing of  decertification motion.  At a minimum, the Bank urges the court to apply some intermediate standard in determining whether to certify the FLSA collective action in which the court scrutinizes the full evidentiary record before it.  Nevertheless, the court will apply the "notice stage" standard for purposes of determining whether notice of this action should be sent to putative class members.  Final certification analysis typically occurs only when merits discovery is closed (or largely complete) and the case is ready for trial.  *See Thiessen*, 267 F.3d at 1102 (second stage of certification analysis occurs "at the conclusion of discovery"); *Winfield v. CitiBank, N.A.*, 843 F. Supp. 2d 397, 402 n.3 (S.D.N.Y. 2012) (heightened standard should only be applied once the

entirety of discovery has been completed); *Burkhart-Deal*, 2010 WL 457127, at *1 n.2 (declining to apply final certification analysis despite substantial discovery related to certification because second step requires merits discovery to be largely complete and case ready for trial).  While substantial certification discovery has taken place here, the magistrate judge has established a two-phased discovery plan under which discovery directed towards certification issues occurs during the first phase and second phase (full merits discovery) begins only after a ruling on the certification question.  The court also declines to apply an intermediate level of scrutiny in the absence of any suggestion from the Tenth Circuit that an examination of the specific issues in this case that might weigh against certification can occur at any stage short of summary judgment proceedings or final certification.

B.    *Rule 23 Certification*

Certification of plaintiffs' proposed California and Washington classes is governed by Federal Rule of Civil Procedure 23.  A class action under Rule 23 is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).[3]  Under Rule 23(a), "the party seeking certification must demonstrate, first, that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

_____

[3]    The parties agree that *Dukes* applies to Rule 23 class actions asserting wage and hour claims.

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class."

*Id.* at 2548.  Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b).  *Id.*  Plaintiffs assert that certification here is appropriate pursuant to Rule 23(b)(3), which applies when questions of law or fact common to class members predominate over any questions affecting only individual members and when a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3). The predominance criterion of Rule 23(b)(3) is "far more demanding" than the Rule 23(a) commonality requirement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id.* at 623.  Generally, the predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issue subject only to individualized proof.  *In re American Int'l Group, Inc. Sec. Lit.*, 689 F.3d 229, 240 (2d Cir. 2012).  Rule 23(b)(3) requires the judge to "make findings about predominance and superiority" before allowing the class.  *Dukes*, 131 S. Ct. at 2559.

Rule 23 does not set forth a "mere pleading standard."  *Dukes*, 131 S. Ct. at 2551.  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Id.*  (emphasis in original).  It may be necessary for the court "to

probe behind the pleadings  before coming to rest on the certification question." *Id.* (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982)).  Certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  *Id.*  The Court has recognized that the district court's "rigorous analysis" will frequently entail some overlap with the merits of the plaintiff's underlying claim.  *Id.*  Indeed, the class "determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Falcon*, 457 U.S. at 160.

## II.    Evidentiary Objections

Before applying these certification standards to the record before it, the court briefly turns to address the Bank's objections to plaintiffs' evidence.  Specifically, the Bank has filed five separate motions to strike  (docs. 502, 510, 511, 538 and 539) evidence relied upon by plaintiffs in both their motion for certification and their reply brief in support of the motion.  The motions to strike are aimed at broad swaths of plaintiffs' evidence, including manager declarations, employee declarations and numerous documents produced by the Bank. The bases for the motions to strike are both numerous and wide-ranging, from standard evidentiary objections such as relevance, hearsay, and lack of foundation to the claim that numerous documents were inadvertently produced by the Bank and are protected from disclosure by attorney-client privilege and the attorney work product doctrine.

The court denies each of the Bank's motions to strike.  A portion of one of the motions to strike (doc. 539) is denied on the grounds that it was untimely filed.  In that motion, the Bank, after the filing of plaintiffs' reply brief, objects to evidence set forth by plaintiffs in the motion

8

itself rather than focusing solely on the reply brief.  These objections should have been raised in connection with the Bank's response to the motion for certification and it was improper for the Bank to raise the objections only after the filing of plaintiffs' reply brief.  The remaining motions are denied as moot because the court grants plaintiffs' motion for conditional certification under the FLSA at the notice stage and, thus, without the level of scrutiny assumed by the Bank's evidentiary objections and denies plaintiffs' motion for Rule 23 class certification even considering all of the evidence that is the subject of the motions to strike.

### III.    Background

In their consolidated complaint, plaintiffs allege that the Bank maintains a uniform, companywide policy and practice requiring its non-exempt employees to perform off-the-clock work in violation of federal and state wage and hour laws.  According to plaintiffs, the Bank's restrictive labor budgets and centralizing scheduling process, coupled with its practice and pressure to aggressively manage overtime, created a company-wide environment that required non-exempt employees, working in often-understaffed branches, to perform off-the-clock work.  Plaintiffs assert that off-the-clock work was frequent and unavoidable and that the Bank implemented its policy through various means, including not permitting employees to record all hours worked; having managers erase or modify employees' recorded hours or forcing employees to erase or modify their own time; providing or promising "comp time" in lieu of paying overtime; and requiring employees to work through unpaid breaks.

The California and Washington Plaintiffs further assert that the Bank's unlawful companywide policy resulted in the Bank's failure to provide meal and rest periods and the

Bank's failure to provide all wages due in a timely fashion upon termination in violation of California and Washington state law. The California Plaintiffs further assert, unrelated to their allegations of a companywide policy requiring off-the-clock work, that the Bank fails to compensate employees for unused vacation time at the time of termination and fails to provide accurate itemized wage statements in violation of California law.

A.   *Corporate Structure*

The Bank operates approximately 5600 retail banking centers throughout the country, in 33 states as well as the District of Columbia. Each banking center is managed by a Banking Center Manager (BCM), an exempt position, and is typically staffed with several non-exempt job positions, including assistant managers, tellers, teller operations specialists, personal bankers, and sales and service specialists. Plaintiffs allege that approximately 227,000 non-exempt employees worked in the Bank's retail banking centers during the class period. All non-exempt employees in the retail banking center report to the BCM who, in turn, reports to a Consumer Market Manager (CMM) and/or Consumer Market Executive (CME). There are roughly 400 markets in the banking center channel. The CMMs and CMEs report to an Area Executive (AE) who, in turn, reports to a Regional Executive (RE). The banking center channel has 41 "areas" spread over 4 regions. The final link in the chain of command is the Bank's senior executives, to whom the REs report.

Non-exempt employees in the retail banking centers typically provide one of two types of Bank services. Tellers and teller operations specialists are primarily responsible for the basic transactional services provided at a retail banking center, including handling customer

transactions such as deposits or withdrawals.  These positions are sometimes referred to as the "Windows" side of the banking center (a reference to the traditional teller window).  Personal bankers and sales and service specialists are primarily responsible for offering and selling financial products and services to individuals and small business customers.  These products include checking accounts, savings accounts, credit cards and loans.  These positions are sometimes referred to as the "Platform" side of the banking center.  Lastly, assistant managers are generally available to perform any banking center job duty as directed by the BCM, including selling to the customers, greeting customers in the lobby, and working with the teller staff.

B.      *The Bank's Timekeeping and Compliance Policies*

From the beginning of the class period through June 2011, all non-exempt Bank employees used the same web-based timekeeping system called "eWorkplace."  After June 2011, the Bank introduced a new timekeeping software package called "MyHR."  Both programs utilize the same basic timekeeping process whereby employees essentially utilized a daily computerized time sheet to record their own time, including the times they started and ended each workday and the times they started and ended each lunch break.  Although employees were expected to enter their time into the system each day, the hours worked (or lunch breaks taken) did not necessarily have to be contemporaneously recorded.  Many employees recorded their daily time entries at the end of each shift and employees generally were able to make edits to their time entries until the end of each week.

It is undisputed that the Bank's written corporate policy mandates that overtime-eligible employees be paid correctly and in compliance with federal and state laws.  Pursuant to that policy, all overtime-eligible employees "are responsible for reporting all time worked, including any and all overtime, . . . by submitting actual time into the timekeeping system each day." Employees are directed to record their "exact time, to the minute" and are expressly prohibited from "performing work 'off the clock' and not recording worked hours."  The written policy further cautions overtime-eligible employees that a failure to accurately enter all hours worked "may result in disciplinary action up to and including termination."

The Bank's timekeeping policy also addresses the responsibilities of exempt employees to monitor compliance with federal and state wage and hour laws.  Toward that end, the policy requires that managers review the hours entered by overtime-eligible employees to ensure that the time entered matches the actual time worked.  The policy emphasizes that overtime-eligible employees "must be paid for all hours worked, including unauthorized overtime" and reiterates to managers that non-exempt employees "are prohibited from performing work and not recording their hours of work."  Finally, managers are cautioned that a failure to ensure that non-exempt employees "accurately enter time worked may result in disciplinary action up to and including termination."

It is further undisputed that the Bank trains and instructs its employees that they are required to record all time worked.  Numerous non-exempt employees, including the named and opt-in plaintiffs in this lawsuit, testified that they knew and understood the Bank's policy.  Some of these employees, however, testified that despite their knowledge and understanding of the policy, they felt "pressured" not to record overtime hours that they worked.  Other non-exempt

12

employees testified by declaration that, consistent with the Bank's written policy requiring employees to record their time accurately to the minute, they recorded all of their time worked, including overtime, and were paid for all hours worked, including overtime.  Thus, the evidence reflects that putative class members understood that the Bank's policy prohibited off-the-clock work and that many putative class members acted in conformity with that policy while other putative class members worked off-the-clock in contravention of this policy.

The Bank has also submitted e-mails among CMMs and/or CMEs and BCMs reflecting an understanding of the Bank's written policy.  These emails generally emphasize that managers must ensure that employees are accurately paid for all time worked, even if that means payment for unauthorized overtime; that payroll violations will "not be tolerated"; "if you work it, we pay it . . . no exceptions"; and that staff must be encouraged to charge all hours worked.  While these same managers also cautioned their employees that "excessive use" of non-scheduled hours must be limited; that branches need to get excess hours under control; and that managers need to get focused on overtime expense, plaintiffs have not submitted a single e-mail drafted by a Bank management-level employee (or any other evidence for that matter) containing any instruction or direction to not pay employees for all hours worked; to modify time cards; to prevent employees from recording their own time; to give "comp time" in lieu of overtime pay; or any other unlawful practice.  At most, manager emails reflect continuous pressure to stay within FTE budgets and to aggressively manage overtime expense—instructions which are undisputedly lawful.

It is also undisputed that the Bank's formal written policy is to provide its non-exempt employees with unpaid meal periods and paid rest periods in accordance with the specific laws

13

of the state where the employee works.  The California and Washington Plaintiffs (the only plaintiffs asserting class claims based on meal and rest period violations) assert that the Bank's companywide policy requiring off-the-clock work caused them to miss meal periods entirely or caused them to work during unpaid meal periods.  While plaintiffs do not contend that working through a paid rest break constitutes "off the clock" work, they contend that the Bank required employees to work through paid rest breaks as an extension of its policy requiring off-the-clock work and in conformity with its practice to deny employees their rights under state wage and hour laws.  Plaintiffs' evidence, however, shows that the California and Washington putative class members had widely varying experiences with respect to their meal and rest periods.

The California plaintiffs have submitted 100 declarations from a putative class of over 35,000 members.  Those declarations, representing less than one-third of one percent of all putative class members, reflect that employees in California had widely varying experiences with respect to their meal periods.  Some declarants report that the Bank permitted them to take their meal periods on each and every qualifying shift; the Bank permitted them to leave the premises for their meal periods; and that they never performed job duties during meal periods.  Others report that the Bank permitted them to take their meal periods on every qualifying shift and permitted them to leave the premises but that they performed job duties during meal periods anywhere from 2% to 100% of the time.  Still others reported, somewhat contradictorily, that the Bank always permitted them to leave the premises for their meal periods but that they nonetheless performed job duties during their meal periods nearly all the time.  The Washington plaintiffs have submitted 30 declarations from a putative class of more than 6000 members and these declarations, representing one-half of one percent of all putative class members, reflect

14

that employees worked through meal periods on an undisclosed number of occasions for varying reasons, ranging from a manager's request to the employee's personal desire to achieve his or her sales goals.

C.    *The Bank's Operational Policies*

In an effort to control labor costs, the Bank utilizes a centralized "Workforce Management" process that establishes for each individual banking center both an "FTE" (full-time equivalent) hours budget and a daily work schedule.  To create an individual branch's FTE budget, the Bank gathers and analyzes historical data and field observations from that branch to project, on a quarterly basis, the level of staffing needed to satisfy all of the requirements for operating that banking center.  An FTE budget accounts for all work-related activities as well as certain non-working time, such as breaks and paid absences.  In utilizing its FTE budget, a branch may use overtime hours, but overtime hours count as 1.5 times a regular hour worked. The existence of overtime hours, then, does not, in and of itself, put a branch over its FTE budget.  In any event, once the FTE budget for a branch is finalized, no manager at any level in the chain of command has the authority to modify the budget.

Plaintiffs contend that the FTE budget of each and every branch location is so restrictive as to render non-exempt employees unable to complete their work without going over budget.  A branch could, however, exceed its FTE budget without utilizing overtime hours.  To the extent overtime hours were used in exceeding an FTE budget, plaintiffs were not uniformly required to work off-the-clock.   The record reflects that branches regularly submitted overtime hours without consequence (with the exception of a possible "talking to" by a CMM or CME).

15

After an FTE budget is finalized, the budget is entered into the Bank's scheduling software program, "Click2Staff," which generates daily work schedules (issued each month) for each non-exempt employee in each banking center.  In addition to the FTE budgets, Click2Staff houses other data to permit the creation of each employee's schedule, such as the employee's availability, the employee's standard hours, customer volume and traffic for that branch, and branch hours.   Once the schedules are created, BCMs access the monthly schedules via Click2Staff.  BCMs are permitted to "tweak" the work schedules between the 1st and 10th days of the month, but are not permitted to add more hours to the schedule, adjust the FTE hours allocated to the branch, or schedule overtime.  Plaintiffs contend that the Bank's centralized scheduling process results in the chronic understaffing of each and every branch location which, in turn, forces those employees who are working at the branch to work overtime hours to complete the work at the branch.

The Bank expects all levels of management to comply with FTE budgets and provides modest incentives for adherence.  The performance of CMMs and CMEs is evaluated, in part, on their market's overall adherence to FTE budgets.  Plaintiff's evidence indicates that 10% of a CMM's or CME's performance evaluation is based on controlling salary and overtime expenses. This factor, then, is but a small portion of the overall performance rating of a CMM or CME. Moreover, plaintiffs do not suggest that it is unlawful for the Bank to consider a CMM's or CME's ability to control expenses in assessing that manager's performance.  Plaintiffs' evidence that the performance of BCMs was based, in part, on adherence to FTE budgets and controlling overtime is fairly weak.  Significantly, the performance "score cards" of BCMs do not evaluate a BCM based on FTE budgets, overtime or controllable losses.  A CMM or CME, however,

might make a general comment on a BCM's performance evaluation relating to these items. ("Continue to insure we hold Teller hrs to 90 and all others to 40 hrs/wk—no overtime.").   A small handful of former managers testified by declaration that the performance reviews of BCMS were tied to overtime usage and FTE adherence but, again, the actual performance score cards in the record do not bear out this statement.

There is no evidence in the record that any BCM or non-exempt employee has ever been terminated for submitting overtime hours or exceeding an FTE budget and scant evidence that any employee has ever been formally disciplined for such conduct.   The record reflects that BCMs are sometimes praised for adhering to FTE budgets and sometimes chastised for permitting his or her branch to go over FTE budgets or for utilizing overtime hours.   Plaintiffs have submitted evidence from approximately 5 named plaintiffs or putative class members who testified that they were "coached" or "talked to" about submitting overtime hours or that they had their hours reduced for the week following a week in which they had submitted overtime. Julia Smay, a former branch manager in Santa Cruz, California, states that she was "written up" by her CME and Regional Manager for trying to submit overtime hours on behalf of her employees.   The experiences of these few managers appears to be the exception rather than the rule.

It is undisputed that non-exempt branch employees are eligible to receive incentive compensation but that such compensation is not tied in any way to a branch's adherence to FTE budgets.   Rather, this compensation depends upon meeting various sales goals for opening new accounts such as credit cards, savings accounts and loans.   CMMs, CMEs and BCMs were also eligible for incentive compensation based on a multitude of factors, including customer

relationships, deposit balance growth, associate readiness, and, among others, controllable losses.  The record does not reflect, however, that "controllable losses" received any particularly great weight in assessing eligibility for incentive compensation.  Taken together, the Bank's performance and incentive compensation plans do not reflect a significant corporate-driven incentive (in terms of job security or compensation) for CMMs, CMEs, BCMs or non-exempt employees to stay within a given FTE budget by unlawfully minimizing overtime hours.

In addition to the Bank's policies concerning FTE budgets and centralized scheduling, plaintiffs contend that the Bank, beginning in August 2005, implemented a "policy" to aggressively manage and "eliminate" overtime which, in turn, led to intense "pressure" to work off-the-clock.  To be sure, there is evidence that the Bank implemented aggressive cost control measures, including strict management of overtime, as a means to generate profit.  Plaintiffs have submitted e-mail communications from CMMs to BCMs reflecting the need to complete branch tasks within the schedule and hours permitted and without resort to overtime hours.  Generally, these emails communicate that any overtime must be pre-approved; that managers must strive to manage their branch's allotted FTE budget without overtime; and that, as summarized in one email, there is "zero budget" for overtime.  The record, however, reflects that managers responded to these "pressures" in individual ways—some submitted overtime hours; some found a way to get the work of the branch completed without resorting to overtime hours; others resorted to unlawful conduct.  Moreover, as noted earlier, plaintiffs have not submitted any e-mail or other document drafted by a Bank management-level employee containing any instruction or direction to not pay employees for all hours worked or to permit off-the-clock work.

18

D.    *The Bank's 2009 Audit*

Plaintiffs have submitted documentary evidence and deposition testimony reflecting that in September 2009, Diane Bomba, a member of the Bank's Audit Department, began conducting a routine audit to assess various deposit risks in the banking center channel. In connection with that routine audit, Ms. Bomba interviewed several employees in the Crystal City, Virginia branch. During those interviews, Ms. Bomba became concerned that employees in the branch were working on Saturdays without recording their time. She did not have similar concerns with respect to the next branch that she visited in connection with the audit. Nonetheless, Ms. Bomba reported to her manager her concerns about the Crystal City branch and advised her manager that she intended to conduct an investigation into the timekeeping practices at the Crystal City branch. Ultimately, that investigation included banking centers in New Jersey, Florida and California as well as the Washington, D.C. area. The data results of the investigation, while not conclusive, caused Ms. Bomba to have concerns about the accuracy of all of the time recorded by employees in those banking centers. Ms. Bomba and her audit team then interviewed 50 to 75 employees in those areas about potential timekeeping violations. After conducting those interviews, Ms. Bomba pulled data for a larger group of employees.

By December 2009, Ms. Bomba had drafted a "Severity 1" audit issue to analyze potential timekeeping violations. Severity 1 audit issues are issues that must be addressed immediately. Beginning in January 2010, the Bank instituted an ongoing process for analyzing timekeeping practices and remediation processes for violations that were uncovered, including reprimands, counseling and payment of appropriate wages. As a result of the audit, policy

documents were issued throughout the company emphasizing the importance of "timekeeping precision."   This message was also disseminated verbally to CMMs, BCMs and non-exempt employees in the branches.   The Bank also began using (and still uses today) a new electronic tool that notifies the Bank's management personnel when a non-exempt employee is conducting transactions 15 minutes or more outside their recorded time.   These discrepancies are identified in timekeeping compliance reports, which are then investigated by the Bank to determine the reason for the discrepancy, the reason for any improper timekeeping, and whether the employee is owed additional pay.   Although the Bank cannot confirm that every non-exempt employee has been compensated for unpaid time discovered by the Bank, it is undisputed that, where appropriate, the Bank has intended payments to be made to employees.

During this same timeframe, Ms. Bomba was also auditing the Bank's staffing levels and drafted a "Severity 2" audit issue on the Bank's staffing forecasting model.   According to Ms. Bomba, understaffing on the platform side of operations was causing customers to abandon lines and offering customers a "poor experience."   Ms. Bomba also noted that tellers were understaffed, though not to the same extent as the platform side.   According to Ms. Bomba, the "lack of consideration for unplanned absences within the capacity model" was one reason that the branches were understaffed.   She also concluded that banking centers were not adhering to the Click2Staff schedules, which contributed to actual staffing below forecasted needs.   Ms. Bomba explained that banking centers did not adhere to the Click2Staff schedules because they did not have employees available to fill the specific schedule.   Ultimately, Ms. Bomba

recommended that the Bank develop a plan to address schedule adherence and staffing gaps caused by unplanned absences.[4]


E.    *Declarations and Depositions from Plaintiffs, Class Members and Managers*

In support of their motion for class and collective action certification, plaintiffs have submitted the declarations of approximately 620 plaintiffs and putative class members. These declarations represent roughly one-quarter of one percent of the potential opt-in FLSA class; less than one-third of one percent of the California class; and roughly one-half of one percent of the Washington class. The vast majority of these declarations are one of two or three different fill-in-the-blank forms presumably prepared by counsel. The declarants, representing a variety of different jobs including tellers, personal bankers and assistant branch managers, assert that they worked overtime for which they were not compensated and that their managers knew that they were performing work without pay. The declarations reflect many different reasons why a non-exempt employee may have worked off-the-clock, including high customer volume; a manager request; understaffing; assisting a specific customer; or the need to meet sales goals.

---

[4]    In their reply brief, plaintiffs contend that Ms. Bomba concluded, in her own words, that the Bank "deliberately understaffs banking centers and . . . has created litigation and reputation risk." Plaintiffs appear to have taken Ms. Bomba's words out of context. Ms. Bomba, in an email to another member of the audit team in which Ms. Bomba lays out various discussion points, states her observation in October 2009 that the Bank's "focus on reducing staff expense has yielded several *unintended consequences*" including that "model assumptions for new Banking Centers deliberately 'understaffs' banking centers and are in conflict with stated objectives of 'Customer Driver' stores." After identifying other unintended consequences, Ms. Bomba observes that the "current process has created litigation and reputation risk." It appears from the e-mail that Ms. Bomba is addressing only "new" banking centers and the fact that Ms. Bomba has placed the term "understaffs" in quotes suggests that she intended to attach to that term some meaning other than its traditional meaning. For these reasons, the court declines to attach to the e-mail the significance that plaintiffs attach to it in their reply brief.

The deposition testimony of various plaintiffs reflects that non-exempt employees performed off-the-clock work because there was "pressure" from their individual branch managers not to record overtime or they were "not allowed" to record all hours.

Along the same lines, plaintiffs have submitted evidence of internal complaints received by the Bank from employees through the Bank's ethics hotline and other avenues for employee complaints.  These internal complaints reflect a wide range of complaints from non-exempt employees concerning timekeeping practices:  not receiving compensation for coming into work early; receiving a 30-minute lunch break but having 60 minutes of time deducted; working up to 2 hours a day off-the-clock without compensation; not receiving compensation for the extra 15 minutes of time spent after the branch closes at 6pm; having a manager submit timecards only for scheduled hours regardless of whether employees come in a few minutes early or stay a few minutes late; a manager making employees change their timecards because employees "for unknown reasons" were not allowed to have overtime; a Bank policy requiring all employees to leave together at the end of the day such that some employees were waiting 5 or 10 minutes without pay after they were finished working; a manager forcing employees to work off-the-clock "to keep the company from knowing" that employees are working beyond their scheduled shifts; a manager telling employees that they need to work offsite events without pay; missing lunch breaks; and managers directing employees not to input overtime hours.

Finally, plaintiffs have submitted the declarations of 33 former BCMs who worked in 16 different states and who generally state that they were required to adhere to FTE budgets and were consistently under pressure from upper management to eliminate overtime.  Some of these managers state that they modified their employees' time records or instructed their employees to

22

modify their time records to eliminate overtime.  Some managers state that they offered "comp time" in future weeks in exchange for their employees agreeing not to record all of their time. Janice Arbel, a former BCM in New York, states that she was instructed by her CME that it was her responsibility to "manage away overtime."  According to Ms. Arbel, if her employees reported overtime, then her CME would call or email and advise her that "this was unacceptable and overtime pay must be approved in advance."  Ms. Arbel further states that because overtime was never pre-approved, the "clear message" was that she could not allow employees to record overtime hours that they worked.  Tim Berry, a former BCM in Michigan, states that his CME advised him that the branch "could not have overtime" and that he should "do what you need to, to get the job done."  Margarita Freeman, a former BCM in the Washington, D.C. area, states that her CMMs "threatened to write [her] up" if she permitted overtime work to be reported. Cassandra McAlister, a former BCM in Missouri, states that her CME and CMM told her "Absolutely no overtime.  I don't care what you have to do."  Julia Smay, a former BCM in California, states that her CMEs told her that the Bank has "zero tolerance" for paying overtime and that if she permitted her employees to record overtime, she would be "written up."  Other BCMs reported receiving instructions from CMMs or CMEs "to take care of the overtime"; that "no overtime is allowed"; and to "get rid of it."  Still others reported that they were required to "explain" any overtime that they submitted and were "called out" during BCM meetings if they had overtime at their branch.

The Bank, in turn, has submitted the declarations of approximately 20 current and former CMEs, BCMs and Assistant Banking Center Managers who state that they complied with the Bank's policy to have employees record their time; that they never instructed employees to not

record overtime hours; that they never deleted overtime from an employee's timesheet; and that they instructed their employees to record all hours worked.  Many of these managers formerly held non-exempt positions with the Bank and they assert that, while they held those positions, they were paid for all overtime hours that they recorded and were never reprimanded or otherwise cautioned about submitting overtime hours.  Some of these managers further state that while they held non-exempt positions, it was a "rare" occasion when overtime hours were needed to complete their work.  Plaintiffs counter that several employees supervised by these managers recorded customer transactions outside their eWorkplace time despite their manager's insistence to record all hours worked. Nonetheless, the Bank's declarations show that, at least in certain retail locations, it was entirely possible to complete the work of the branch without resorting to overtime violations and without departing from the Bank's policy to pay employees for all hours worked.

F.    *The Bank's Transactional Data*

Plaintiffs have retained an expert, Dr. Martin Shapiro, to perform a preliminary analysis of transactional data produced by the Bank.  Dr. Shapiro has concluded based on his analysis that there is a "pervasive pattern" of transactional work being performed by Bank employees outside of their reported and paid work times—*i.e.*, "off the clock."  According to Dr. Shapiro, the data analysis reflects that off-the-clock work is performed by employees in all non-exempt job categories across the country, in all regions and markets where the Bank operates.  Dr. Shapiro opines that the unpaid work amounts to a "substantial amount of unpaid overtime."

By way of background, the Bank uses various electronic systems which capture customer transactions performed by Bank employees, including a system called Merlin.  Merlin shows transactions that occur at teller windows and personal banker platforms based on information identifying the terminal at which the transaction occurred and the employee who performed the transaction.  Merlin also records the date and time of the transaction.  The Bank's timekeeping software, as noted earlier, maintains records of all time recorded and paid to Bank employees.  Dr. Shapiro fully analyzed two months' worth of data—May 2010 and February 2011—for a comparison of the transactional data with employees' timekeeping data.  This comparison purportedly permitted Dr. Shapiro to determine whether customer transactions were conducted by Bank employees during periods when the time records reflected that the employee was not "clocked in."  Dr. Shapiro asserts that his approach is a conservative one because it does not account for Bank employees performing non-transactional work (but work nonetheless).  Ultimately, Dr. Shapiro analyzed data for 12,552 employees working in approximately 2000 banking centers across the country during May 2010 and found that 11,908 (94.87%) employees performed off-the-clock work (defined as performing customer transactions outside recorded work time).  For the month of February 2011, Dr. Shapiro analyzed data for 15,435 employees working in approximately 2000 banking centers across the country and found that 13,296 (86.14%) employees performed off-the-clock work.  Dr. Shapiro then segregated the data for California and Washington employees and found similarly high percentages of off-the-clock violations.

Dr. Shapiro's analysis, however, is substantially flawed because he defines an off-the-clock violation much more broadly than the pertinent wage and hours laws at issue here.

Generally speaking, the wage and hours laws at issue here prohibit work without pay.  Dr. Shapiro, however, defines an off-the-clock violation as work outside of the employee's recorded hours.  This is particularly troubling in the context of this case because it is undisputed that Bank employees do not utilize a traditional time clock but rather enter their working hours in the Bank's computer system whenever they are inclined to do so—at the end of the day, at the end of the week or contemporaneously.  Thus, an employee might have actually worked from 9:05am until 5:05pm but might sit down at the end of that shift and enter his or her hours worked as 9:00am to 5:00pm.  In that instance, if the employee conducted a transaction at 5:01pm, Dr. Shapiro would find an off-the-clock violation when none occurred.  It is easy to imagine employees similarly "rounding" their lunch breaks, with the same erroneous (or at least unreliable) conclusions by Dr. Shapiro.

IV.     **Collective Action Certification under the FLSA**

        In support of their motion for conditional certification, plaintiffs contend that they have adequately shown, for purposes of sending notice, that the putative class members were similarly denied overtime under "a single decision, policy or plan" requiring widespread off-the-clock work.  *See Thiessen*, 267 F.3d at 1102.   The court concludes that plaintiffs have satisfied their minimal burden of providing substantial allegations that the Bank maintained an unofficial policy requiring off-the-clock through the use of labor budgets, aggressive management of overtime, and scheduling processes that result in the understaffing of branch locations.   It is undisputed that the Bank utilized labor budgets, expected its managers to adhere to those budgets and emphasized the reduction of overtime wage expenses.  Plaintiffs have submitted

evidence that the Bank's upper management, in at least some instances, chastised managers who did not adhere to their labor budgets or who regularly permitted their employees to work overtime hours.  Plaintiffs have also submitted evidence that non-exempt employees worked off-the-clock (albeit under varying circumstances and to varying degrees) and that at least some of those employees did so at the direction of a manager.  Plaintiffs, then, have made the modest factual showing necessary for purposes of sending notice of the action to putative class members.

The Bank, of course, vigorously opposes conditional certification by highlighting that its operational policies are undisputedly lawful; that any FLSA violations were the result of individualized issues specific to individual banking centers, employees and managers; and that there are simply too many variations in the nature and extent of the alleged violations to support the existence of a uniform policy to deny overtime or require off-the-clock work.  While one or more of these arguments may yet prevail, they are not meaningful to the court at this stage of its analysis in light of the minimal showing plaintiffs are required to make at this stage.  *See Vargas v. General Nutrition Centers, Inc.*, 2012 WL 3544733, at *7-8 (W.D Pa. Aug. 16, 2012) (evidence that employer budgeted certain number of labor hours for each store; managers were expected to perform work without incurring overtime; and managers engaged in time-shaving was sufficient "hold the case over until the next stage of the certification analysis" despite employer's contention that fact-intensive, individualized determinations made the case unsuitable for collective treatment, which would be reviewed at a later stage); *Pereira v. Foot Locker, Inc.*, 261 F.R.D. 60, 66-67 (E.D. Pa. 2009) (granting conditional certification where plaintiff alleged and supported a cohesive policy or plan to deny overtime and demonstrated its

alleged consequences nationwide; individual concerns significant only during step-two analysis). In short, plaintiffs have met their burden for conditional certification of their FLSA collective action claims.[5]

## V.   Class Certification under Rule 23

Plaintiffs move for class certification pursuant to Federal Rule of Civil Procedure 23 of a class of California employees as follows:

> All non-exempt workers employed in Defendants' banking centers in California from December 31, 2003 to the present.

The California Plaintiffs assert claims regarding the Bank's failure to pay straight and overtime wages for "off the clock" work in violation of California Labor Code §§ 204, 210, 218, 510, 515, 558 and 1194; failure to provide meal and rest periods in violation of California Labor Code §§ 226.7 and 512; failure to provide accurate itemized wage statements in violation of

---

[5]    One minor issue concerning plaintiffs' FLSA collective action claims concerns plaintiffs' contention that the Bank did not include bonus and incentive compensation received by employees when calculating the regular rate of pay for purposes of calculating overtime. Plaintiffs raised this assertion in their statement of facts in their motion for certification but did not mention it in any respect in the argument portion of their brief. The Bank, in turn, did not address the contention in its response. In reply, then, plaintiffs assert that whether "the Bank did not properly include bonuses and incentives in its overtime calculations as required by the FLSA" is "an issue sufficient for certification on its own."

If required to do so, the court would conclude that plaintiffs failed to put forward this issue for independent certification when they failed to include it in the argument portion of the brief but merely referenced it in one of nearly 125 detailed factual allegations. But the court need not reach the issue because plaintiffs, contrary to their suggestion in their reply brief, assert in their sur-surreply that "including bonus and incentive pay in the overtime calculation is simply a component of damages calculations." To be clear, then, plaintiffs are not deemed to seek (and will not be permitted to seek) to hold the Bank separately liable under the FLSA for its asserted failure to include bonus and overtime pay in its overtime calculations.

California Labor Code § 226; forfeiture of vacation pay in violation of California Labor Code § 227.3; failure to timely pay wages due and owing at the time of termination in violation of California Labor Code §§ 201-203; unfair competition in violation of California Business and Professions Code § 17200; and for civil penalties, fees and costs pursuant to California's Private Attorneys General Act (PAGA), California Labor Code § 2698 et seq.

In addition, plaintiffs move for class certification pursuant to Rule 23 of a class of Washington employees as follows:

> All non-exempt workers employed in Defendants' banking centers in Washington from September 15, 2006 to the present.

The Washington Plaintiffs assert claims regarding the Bank's failure to pay overtime, straight and minimum wages for "off-the-clock" work in violation of Rev. Code Wash. §§ 49.46.130 & 49.46.090; failure to provide meal and rest periods in violation of Rev. Code Wash. § 49.12.020 and Wash. Admin. Code 296-126-092; failure to time pay wages owed upon termination in violation of Rev. Code Wash. § 49.48.010; and violation of the Washington Consumer Protection Act, Rev. Code Wash. § 19.86.010 et seq.

The Bank does not dispute that the proposed classes are so numerous as to satisfy Rule 23(a)(1). Indeed, the parties agree that there are more than 35,000 putative class members in the California class and more than 6000 putative class members in the Washington class. The Bank's primary challenges to certification of plaintiffs' off-the-clock and meal period claims focus on the issues of commonality and predominance. As will be explained, the court declines to address the commonality issue in the context of the off-the-clock and meal period claims because, even assuming that plaintiffs' claims depend upon a common contention that is capable

of classwide resolution, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), the court nonetheless denies Rule 23 certification on the grounds that any common contentions that might exist are overpowered by individual issues.  Certification of plaintiffs' remaining state law claims is denied for reasons explained more fully below.

**A.      Off-the-Clock Claims**

The California and Washington Plaintiffs bring claims for failure to pay straight time, overtime and, in the case of the Washington Plaintiffs, minimum wages in light the Bank's restrictive FTE budgeting and scheduling practices and significant "top-down" pressure to avoid overtime which, according to plaintiffs, requires employees to perform off-the-clock work.  The Bank contends that plaintiffs have not satisfied their burden of showing that certification of these claims is appropriate and, more specifically, that plaintiffs have not established commonality under *Dukes* and have not established the more demanding requirement of predominance under Rule 23(b)(3).  As will be explained, the court declines to address the commonality issue because, even assuming the existence of the policy alleged by plaintiffs, certification of the California and Washington Plaintiffs' off-the-clock claims is not appropriate because individual issues specific to each putative class member's claim overpower any common questions.

To begin, plaintiffs have not submitted any reliable, common proof that might establish an off-the-clock violation for each member of the class. Even assuming that the Bank had an unofficial policy requiring off-the-clock work, the Bank is only liable to those putative class members who were subjected to the policy.   And no common proof exists that might

demonstrate that each class member was subject to the policy or that the Bank would otherwise be liable to them for off-the-clock work. Plaintiffs contend that Dr. Shaprio's analysis is sufficient to prove each class member's claim. But it is not possible for anyone to accurately ascertain whether an employee in fact worked off-the-clock simply by comparing the transactional data with that employee's timekeeping records. Bank employees do not swipe a timecard on the way in and out of work. They are free to enter their working hours into eWorkplace or MyHR whenever it is convenient for them to do so—often at the end of the workday. Thus, because Dr. Shapiro's analysis does not account for the fact that employees reasonably might "round" their hours worked, it is not sufficiently reliable to show, on a classwide basis, that violations occurred. Evidence of the Bank's liability, then, would necessarily vary from member to member.

Plaintiffs' off-the-clock claims here, then, are significantly different from off-the-clock claims in which all class members undisputedly are affected by the employer's allegedly unlawful policy. In the donning and doffing context, for example, if it is established that the employer unlawfully denied wages for donning and doffing activities (or, in a related vein, unlawfully paid its employees on a "gang time" basis), then the employer is undisputedly liable to each class member—all of whom undisputedly engaged in donning and doffing activities and, thus, performed work which was unpaid. In such circumstances, predominance of common questions is readily established. *See Garcia v. Tyson Foods, Inc.*, ___ F. Supp. 2d ___, 2012 WL 3594212, at *6 (D. Kan. Aug. 21, 2012) (predominance established under Rule 23 for donning and doffing claims). Here, even if plaintiffs established the unofficial policy they allege the Bank maintained, there is no way in the class action context to prove the Bank's

liability to each member because there is no evidence that each class member in fact was affected by the unlawful policy. Indeed, plaintiffs do not even allege a systematic failure to pay overtime to employees. The record is replete with evidence that branch locations frequently submitted overtime hours and the Bank paid employees for those hours. There is evidence that many non-exempt employees recorded all time worked and were paid for it, including overtime. The record also reflects that managers responded to the alleged unlawful policy in individual ways—some submitted overtime hours; some found a way to get the work of the branch completed without resorting to overtime hours; others resorted to unlawful conduct. Simply put, proof of the policy does not establish liability to all class members.

A closer look at the California Plaintiffs' evidence shows why class treatment of their off-the-clock claims is unworkable. By way of example, plaintiffs have submitted the declaration of Julia Smay, a former branch manager in Santa Cruz, California. Ms. Smay states that while she was a branch manager, she instructed her employees to leave the branch "when they hit overtime." According to Ms. Smay, the branch employees "refused to leave" the branch because they "felt bad" for the employees who were scheduled to stay and close the branch, believing, essentially, that many hands make light work. These employees, then, elected to log off of the system but remain at the branch working until the branch was closed. Ms. Smay's testimony exemplifies why plaintiffs' claims cannot be resolved on a classwide basis. Surely, a companywide policy requiring off-the-clock work cannot account for the timekeeping violations of employees who, in opposition to their supervisor's direct orders to leave the branch, voluntarily work off-the-clock because they "feel bad" for their coworkers.

32

Moreover, the fact that a putative class member performed off-the-clock work does not necessarily mean that the Bank is liable to that employee for a violation of the California Labor Code. This, then, is another reason why individualized inquiries would be both necessary and voluminous. The evidence reflects a myriad of reasons why an employee might have performed off-the-clock work and the Bank would not necessarily be liable under all the circumstances presented. It may have occurred to meet sales quotas, assist customers, help a coworker, or to catch-up on paperwork. It may have occurred voluntarily (and without the knowledge of a manager), because a manager requested it, because a customer demanded it, because the employee succumbed to unspoken "pressure" or "culture" encouraging off-the-clock work.

One case that is particularly instructive on these issues is *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344 (W.D.N.Y. 2011). In *Brickey*, the plaintiffs alleged that Dollar General Stores maintained a practice of allocating limited payroll hours to each store and implemented a nationwide scheduling program which, together, resulted in managers' "shaving" off time from time records and/or requiring employees to perform tasks off-the-clock. *Id.* at 345. The plaintiffs further alleged that each store was required to operate within its payroll hours allocation, without employees working overtime, and that if a store manager exceeded the payroll hours or permitted overtime, then he or she could be subject to reprimand or termination. *Id.* at 346. Managers were also rewarded with increased bonuses for staying "under budget." *Id.* In addition to seeking certification of a nationwide FLSA class, the plaintiffs sought Rule 23 certification of wage and hour claims under New York, Ohio, Maryland and North Carolina state laws. *Id.* at 345.

33

The district court found that the plaintiffs failed to demonstrate by a preponderance of the evidence common legal and/or factual issues predominated over individualized claims.   As explained by the district court:

> Although plaintiffs allege that uniform, nationwide Dolgencorp policies are the basis for their claims, the plaintiffs' claims essentially concern the indirect *effect* of certain policies—as they were enforced or abused to varying degrees by certain managers in certain stores and in certain ways.  Because the plaintiffs' claims arise in different stores, under different managers, who reacted to Dolgencorp's hours allocation policy and other policies cited by plaintiffs, to varying degrees and in different ways, the claims are too highly individualized to form the basis for a proper class action.

272 F.R.D. at 349 (emphasis in original).  Other factors contributed to the individualized nature of the inquiry, including affidavits submitted by managers who averred that they fulfilled their duties without resorting to FLSA violations, plaintiffs' concession that the hours allocation policy was not facially unlawful, and that the defendant's official policy (as described in the employee handbook) required payment for all hours worked.  *Id.* at 347.

The court is also persuaded by the district court's decision in *Burkhart-Deal v. CitiFinancial, Inc.*, 2010 WL 457122 (W.D. Pa. Feb. 4, 2010), in which the plaintiff sought certification of a Rule 23 class of 700 financial service representatives (FSRs) who worked in any of Pennsylvania's 110 retail locations during the three-year period prior to the filing of the complaint.  *Id.* at *1-2.  Plaintiff alleged that the defendant maintained a "policy" requiring FSRs to work overtime without compensation which was implicitly imposed by a conglomeration of various practices, including sales targets, labor budgets, bonus incentive plans, demanding job responsibilities, the infrequency of overtime pre-approval and the defendant's desire to maximize profits.  *Id.* at *2, *4 & *5 n.12.   The plaintiff did not contend

34

that the use of sales targets, requiring pre-approval of overtime, putting performance pressure on employees or seeking to maximize profits were illegal practices. *Id*. at *5 n.12. Rather, plaintiff sought to have "the legal system assess whether some melding of these practices resulted in undue or unreasonable pressure" on employees to work off-the-clock. *Id*.

Despite the relatively small class size, the district court denied the motion for certification, finding that the common issues were "vastly overpowered" by individual issues. *Id*. at *5. The court began its analysis of the predominance issue with a recognition that the defendant's written policy requires pre-approval of overtime, as well as payment of overtime, and requires employees to accurately record all hours worked. *Id*. at *4. The court also noted that while overtime was granted infrequently, it was not systematically denied. *Id*. In finding individualized issues that precluded class treatment, the court noted that departures from the defendant's written policy differed in significant ways rather than presenting an unvarying and consistent pattern. *Id*. According to the court, the plaintiff's evidence reflected varying reasons that employees worked overtime, from working over lunch to assist a customer physically present in the office to working late to meet sales quotas, as well as varying subjective reasons for the perceived need to work off-the-clock, from employees who felt "discouraged" from claiming overtime or "understood" that they were not supposed to submit overtime to those who received managerial directives not to seek overtime. *Id*. at *4 & n.8. The court also noted the defendant's evidence that at least 20 Pennsylvania employees did not feel that they were required to discount their hours worked and were not denied overtime in any respect. *Id*. at *5. Ultimately, the court found "no factually and legally analogous cases that would support a predominance finding" in the matter before it. *Id*.

35

For the same reasons expressed in these cases, plaintiffs have not shown that any common question that might exist would predominate over individual issues. Significant individualized assessments would be required to determine whether in fact the Bank is liable to each putative class member despite the alleged existence of an unofficial policy requiring off-the-clock work. Class treatment is simply not workable in this context. The court, then, joins the vast majority of district courts that have denied certification on predominance grounds in factually analogous contexts and denies certification of the California and Washington plaintiffs' off-the-clock claims. *See* Flores v. CVS Pharmacy, Inc*., 2010 WL 3656807, \*6 (C.D. Cal. Sept. 7, 201*0) (where plaintiffs alleged that corporate culture and store understaffing resulted in off-the-clock work, certification inappropriate in part because widely varying declarations highlighted individualized nature of inquiry and showed that proposed class invariably included non-class members who averred that they did not work off-the-clock); *Mateo v. V.F. Corp., 2009 WL 3561539, at \*6 (N.D. Cal. Oct. 27,* 2009) (denying California Rule 23 class where plaintiffs alleged off-the-clock work resulting from chronic understaffing; to prove liability, each plaintiff would need to demonstrate that he or she in fact worked off the clock; that he or she was instructed to do so; that the instructions were pursuant to corporate practice rather than in opposition to corporate policy; and that the store was in fact understaffed at the time); *Koike v. Starbucks Corp., 2008 WL 7796650, at \*8-10 (N.D. Cal. June 2*0, 2008) (denying Rule 23 certification in face of evidence that strict labor budgets and automated scheduling incentivized off-the-clock work; significant individual fact determinations would be required to establish that in fact this occurred for it does not follow that simply because employees had an incentive to work off-the-clock that they did so), *aff'd*, 378 Fed. Appx. 659

(9th Cir. 2010); *In re Wal-Mart Wage & Hour Employment Practices Lit*., 2008 WL 3179315, at *19 (D. Nev. June 20, 2008) (plaintiffs alleged that off-the-clock work resulted from companywide policies of aggressive cost control, understaffing and restrictions on overtime; common issues did not predominate in light of wide variety of alleged deviations in different situations by local store managers exercising their own judgment) (MDL).

**B.    Meal Periods**

The California and Washington plaintiffs also seek certification of their meal period claims, contending that the Bank's restrictive FTE budgets and scheduling models forced employees to either perform work during unpaid meal breaks or to skip meal breaks entirely. Plaintiffs' claims are based on California and Washington state laws that generally require employers to provide a 30-minute meal period to an employee if that employee's shift is longer than 5 hours.  *See* Cal. Labor Code § 512(a); Wash. Admin. Code 296-126-092.  The meal period may be unpaid so long as the employee is relieved of all work duties.  Industrial Welfare Commission (IWC) Wage Order No. 4-2001, Cal. Code Regs. tit. 8, § 11090 Wash. Admin. Code 296-126-092(1).  It is undisputed that the Bank's formal written policy is to provide its non-exempt employees with meal periods in accordance with the specific laws of the state where the employee works.  According to plaintiffs, class-wide treatment of these claims is nonetheless appropriate because the claims stem from the Bank's centralized scheduling and staffing policies.  As will be explained, the court denies certification of the California and Washington plaintiffs' meal period claims.

37

As explained above in connection with plaintiffs' off-the-clock claims, plaintiffs have not demonstrated for purposes of Rule 23 that any common questions concerning their off-the-clock claims will predominate over individual issues. Because plaintiffs' meal period claims are simply a subset of their broader off-the-clock claims, plaintiffs similarly cannot establish for purposes of Rule 23 that any common contentions relating to their meal period claims will predominate over individual issues. Moreover, certain issues specific to the meal period violations alleged in this case highlight the conclusion that individual issues would surely predominate over any common policy requiring employees to work through unpaid meal periods.

To begin, there is no reliable, common proof that demonstrates meal period violations for putative class members. Even assuming the existence of an unofficial policy requiring employees to work through meal periods, it is undisputed that some employees (and, thus, some putative class members) received their meal periods on each and every qualifying shift and that they never performed job duties during their meal periods. Clearly, then, the Bank is not liable to every class member for meal period violations and, in the absence of a common method to determine which employees have actually sustained meal period violations, individualized issues necessarily will predominate. While plaintiffs contend that the common proof of violations lies in the Bank's own data as analyzed by Dr. Shapiro, the court has already concluded that Dr. Shapiro's analysis is not reliable and cannot demonstrate that absent class members sustained meal period violations. As described earlier in connection with the off-the-clock claims, neither Dr. Shapiro nor anyone for that matter can accurately ascertain whether an employee worked during an unpaid meal period simply by comparing the transactional data with

38

that employee's timekeeping records.  Just as employees do not swipe a clock on the way into work in the morning and the way out of work in the evenings, Bank employees do not swipe timecards on the way to and from lunch.  Rather, employees log into eWorkplace and record their lunch breaks.  It is not necessary or required for an employee to record his or her lunch break contemporaneously with the lunch break itself.  Thus, an employee might take a lunch break from 12:05pm to 12:35pm and then return to eWorkplace and record the break as 12:00pm to 12:30pm.  In that case, if the employee conducted a transaction at 12:04pm, it would register under Dr. Shapiro's analysis as a meal period violation when, in fact, no violation existed.  Because Dr. Shapiro's analysis does not account for the fact that employees reasonably might "round" or "guesstimate" their lunch breaks, it is substantially flawed.

In the absence of common proof of liability, individualized inquiries would necessarily be required to establish the Bank's liability to each member of the class.  It is undisputed that employees in California may choose to continue working in lieu of taking a meal period, so long as the employer itself relinquishes control over the employee during that time.  *See Brinker v. Superior Court*, 53 Cal. 4th 1004, 1039-40 & n.19 (Cal. 2012).  And Washington law "does not require that breaks be taken" so long as an employee is paid for time spent on duty during a break period.  *See Eisenhauer v. Rite Aid Headquarters*, 2006 WL 1375064, at *3 (W.D. Wash. May 18,* 2006).  Thus, even to the extent Dr. Shapiro's analysis accurately notes those occasions in which an employee's records do not indicate a "clocked-out" meal period at all, the analysis fails to account for whether any or all of the missed meal periods were voluntary on the part of the employee.  These deficiencies in Dr. Shapiro's analysis further reflect that plaintiffs' meal period claims cannot be resolved on a class-wide basis.  *See Lamps Plus Overtime Cases, ___*

39

Cal. Rptr. 3d ___, 2012 WL 3587610, at *6 (Cal Ct. App. Aug. 20, 2012) (trial court was correct in deciding that substantial evidence demonstrated that individualized inquiry would be required on meal period claims; reason for missed meal period must be individually ascertained because no violation of law if he or she willingly decided to forego break); *Chavez v. Lumber Liquidators, Inc.*, 2012 WL 1004850, at *8 (N.D. Cal. Mar. 26, 2012) (missed meal period class failed to meet predominance requirements of Rule 23(b) where employer maintained a lawful written policy and court would need to engage in individualized inquiries regarding, among other things, whether the employer forced that employee to work through the meal break); *York v. Starbucks Corp.*, 2011 WL 8199987, at *26 (C.D. Cal. Nov. 23, 2011) (denying certification of meal period claims based on predominance; determining whether a given employee suffered a meal break violation will largely depend on numerous highly fact-specific inquiries as to the reason why the employee did not take a break); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 641 (N.D. Cal. 2010) (denying certification of meal period claims on predominance grounds because an individualized inquiry would be required to determine whether the employer impeded, discouraged or prohibited breaks or whether employees waived the break).

Because plaintiffs have not demonstrated that any common contentions relating to their meal period claims would predominate over the highly individualized inquiries implicated by those claims, the court denies certification of the California and Washington plaintiffs' meal period claims. *Hernandez v. Chipotle Mexican Grill, Inc.*, ___ Cal. Rptr. 3d ___, 2012 WL 3579567, at *10 (Cal. Ct. App. Aug. 21, 2012) (trial court reasonably concluded that individual issues predominated with respect to meal period claims where plaintiffs would have to prove violations on an individual basis); *Chavez*, 2012 WL 1004850, at *8 (argument that

40

companywide understaffing caused meal break violations did not trump individual questions, where court would then have to inquire in each instance whether understaffing resulted in the missed meal period); *Mateo v. V.F. Corp.*, 2009 WL 3561539, at *6 (N.D. Cal. Oct. 27, 2009) (finding that individual issues predominated where employees had to work through meal breaks due to lack of minimum staffing).

## C.    Rest Periods

The California and Washington Plaintiffs contend that the Bank's restrictive labor budgets and scheduling processes required employees to work not only off-the-clock but also through paid rest periods.  The Bank maintains a formal policy to provide its non-exempt employees with periodic rest breaks in accordance with the specific laws of the state where the employee works.  Both California and Washington generally require employers to provide employees with paid rest periods of 10 minutes for every 4 hours of working time.  *See* Industrial Welfare Commission (IWC) Wage Order No. 5-2001, Cal. Code Regs. tit. 8, § 11050; Wash. Admin. Code 296-126-092.  If an employer fails to provide a rest period in accordance with the law, the employer is required to pay a penalty to the employee equivalent to one hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.  According to plaintiffs, despite the Bank's written policy, the Bank's practices either required or actively encouraged employees to skip their legally protected rest periods and the Bank failed to provide penalty wages for missed rest periods.

Even assuming that plaintiffs' evidence is sufficient to establish an unofficial policy requiring employees to forego authorized rest breaks in favor of continuing to work, the court

nonetheless denies certification of plaintiffs' rest period claims.  Because state law does not require the Bank to record or otherwise track whether and when employees did or did not take rest breaks, no such records are available and plaintiffs, then, have conceded that they do not have an analysis of transactional data showing that employees performed work during paid rest periods.  It is also undisputed that the Bank, even assuming the existence of a policy, did not require employees to skip rest periods all the time or even on a consistent basis—plaintiffs' evidence, at best, indicates that the occasions when employees missed rest periods were sporadic.

Although plaintiffs allege that "California and Washington declarants reported, on a widespread basis, working through all or a portion of their rest breaks," the record simply does not support this assertion.  To date, the parties estimate that there are over 35,000 putative class members in the California class.  Of the 100 declarants who worked or work for the Bank in California, less than half of the declarants even address rest periods.  Forty (40) declarants reported that they have worked through at least one rest period; four (4) declarants reported that they never worked through a rest period.  The remainder of the California declarants either do not address rest periods in their affidavits or have submitted form affidavits that speak only to "unpaid breaks," "unpaid time" or "meal breaks"—none of which would encompass what are undisputedly paid rest breaks.  In the end, then, plaintiffs have submitted declarations supporting their rest break claims from less than one-eighth of one percent (.00125%) of putative class members.  Similarly, the parties estimate that there are over 6000 putative class members in the Washington class.  Of the 30 declarants who worked or work for the Bank in Washington, not a single one (including the class representatives) reports that he or she worked through a paid rest

period.  The vast majority of the Washington declarants have submitted fill-in-the-blank form declarations that speak only to "unpaid breaks," "unpaid time" or "meal breaks" rather than the paid breaks and penalty wages that are the subject of the rest period claims.  The handful of declarants who have submitted non-form affidavits do not address paid breaks or rest periods in any respect.  In the absence of a single Bank employee from Washington coming forward to report that he or she has worked through a rest period, it is difficult to see how these claims are amenable to class treatment under Rule 23.

It is impossible to determine, then—at least on a class-wide representative basis—when or whether employees missed their rest periods.  *See* Cortez v. Best Buy Stores, LP, 2012 WL 255345, at *4 (C.D. Cal. 2012) (denying certification of rest period subclass where there was no common method to determine membership in the class in the absence of an allegation that the employer categorically refused to permit breaks; individual inquiry would need to be made as to each employee).  In short, plaintiffs have not identified any means by which class membership might be ascertained.

An additional consideration weighing against certification exists with respect to the California class.  Under California law, an employee is free is waive his or her rest period. Brinker Restaurant Corp. v. Superior Court, 53 Cal. 4th 1004, 1033 (Cal. 2012).  Thus, any showing on a class basis that plaintiffs or putative class members worked through their rest breaks would not necessarily establish, without highly individualized questions concerning waiver, that the Bank violated California law.  This is particularly true where, as here, the Bank's written policy is lawful and acknowledges the requirements of California law.  *Compare* *id.* (error to deny certification of rest break claims based on individualized issues concerning

43

waiver where the company's written policy authorized only one rest break during a 7-hour shift but the law required 2 rest breaks; no issue of waiver arises for a rest break that is uniformly unauthorized) *with Chaaban v. Wet Seal, Inc., 2012 WL 1114568, at \*7 (Cal. Ct. App. Apr. 4,* 2012) (trial court correctly denied certification of rest break claims where plaintiffs offered no common method of distinguishing between instances when employees were not permitted to take breaks and instances when employees elected not to take breaks and employer could be liable only for the former instances) *and York v. Starbucks Corp., 2011 WL 8199987, at \*32 (C.D. Cal.* 2011) (denying certification of rest break claims on predominance grounds; determining whether a given employee suffered a violation will "largely depend on numerous highly fact-specific inquiries as to the reason why the employee did not take a break) *and Washington v. Joe's Crab Shack, 271 F.R.D. 629, 641-42 (N.D. Cal.* 2010) (denying certification of rest break claims on predominance grounds where written policy was fully compliant with the law and individualized inquiries would be required to determine whether and when rest breaks were missed).

Because plaintiffs have not demonstrated how their rest period claims could be determined for the class short of individualized proof, the California and Washington Plaintiffs have not demonstrated that class certification of their rest break claims is warranted.

### D.   Itemized Wage Statements

The California Plaintiffs also seek to certify claims alleging violations of California Labor Code § 226, which requires that employers furnish "an accurate itemized statement in writing" to employees at the time of each payment of wages.  The itemized wage statement must

accurately reflect, among other things, gross wages earned; total hours worked; net wages earned; dates of the applicable pay period; and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee." Cal. Labor Code § 226(a). Under subsection (e) of the same provision, an employee "suffering injury as a result of a knowing and intentional failure by an employer to comply with [section 226(a)] is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000)."

Plaintiffs allege that the wage statements issued by defendants prior to March 14, 2009 were deficient in three respects:  the Bank's semi-monthly pay periods resulted in the periodic underreporting of hours worked and, accordingly, an underpayment of wages; the semi-monthly pay periods resulted in an inaccurate reporting of total hours actually worked; and the statements did not include an hourly rate of pay (but included, instead, an annual rate of pay).[6]  By way of background, the Bank's non-exempt banking center employees were paid on a semi-monthly basis prior to March 14, 2009.  Regardless of the number of hours an employee actually worked, each semi-monthly paycheck paid employees one twenty-fourth of their annual salary based upon their scheduled hours.  Any "exceptions" to the standard hours (such as overtime hours) were made (and paid) on a subsequent semi-monthly paycheck.  On this semi-monthly pay

---

[6]     Plaintiffs also contend that their wage statements are inaccurate because any hours worked "off the clock" by employees are necessarily not reflected on those wage statements. Certification of these "derivative" claims is not appropriate because the court has denied certification of the underlying off-the-clock claims.

scheme, paychecks issued by the Bank always paid for 86.67 hours of work when the employee's standard hours pay would have been 80, 88 or 96 hours of straight time depending on whether there were 10, 11 or 12 work days in the particular pay period. Thus, the standard hours pay did not correspond to the hours actually worked. Moreover, for those pay periods with 88 or 96 hours of straight time or scheduled work, employees were systemically underpaid because their paychecks paid for only 86.67 hours of work. Of course, in those pay periods with 80 hours of straight time or scheduled work, employees were overpaid. It is undisputed that an employee's pay over the semi-monthly pay cycle "evens out by the end."

In its opposition to the motion for class certification, the Bank disputes only whether the California Plaintiffs have satisfied the "injury" requirement set forth in § 226(e). According to the Bank, none of the California Plaintiffs has suffered an injury within the meaning of the statute and, even if some hypothetical "mathematical" injury might suffice to establish injury under the statute, neither the named California plaintiffs nor any putative class members incurred any such injury. Plaintiffs respond that they have shown the requisite injury by demonstrating both systematic underpayment and "mathematical" injury and, even if the record at this juncture does not reflect an injury, California courts have indicated that certification is nonetheless proper. As will be explained, plaintiffs have not shown that their itemized wage statement claims are appropriate for class treatment.

California courts have made clear that the injury requirement in § 226(e) "cannot be satisfied simply if one of the nine itemized requirements . . . is missing from a wage statement." *Alonzo v. Maximus, Inc*., 832 F. Supp. 2d 1122, 1134 (C.D. Cal. 2011) (quoting *Price v. Starbucks Corp*., 192 Cal. App. 4th 1136, 1142 (2011) and citing *Jaimez v. DAIOHS USA, Inc*.,

46

181 Cal. App. 4th 1286, 1306–07 (2010) (employees "must establish 'actual injury' arising from the receipt of inaccurate paystubs").  Rather, "the statute requires that an employee may not recover for violations of [section 226(a)] unless he or she demonstrates an injury arising from the missing information."  *Id.* (quoting Price, 192 Cal. App. 4th at 1142–43).  Courts interpreting California law have recognized that "the possibility of not being paid overtime, employee confusion over whether they received all wages owed them, difficulty and expense involved in reconstructing pay records, and forcing employees to make mathematical computations to analyze whether the wages paid in fact compensated them for all hours worked" can constitute an injury under section 226(e).  *Id.* (citing *Ortega v. J.B. Hunt Transp., Inc.*, 258 F.R.D. 361, 374 (C.D. Cal. 20*09).  Thus, if a plaintiff is required to engage in discovery and mathematical computations to reconstruct time records in order to determine if he was correctly paid, then the plaintiff has suffered an injury.  *Reinhardt v. Gemini Motor Transport*, ____ F. Supp. 2d ___, 2012 WL 2932678, at *2 (E.D. Cal. July 18, 2012) (citations omitted).  However, if a claimed injury is based merely upon the plaintiff having to perform "simple math" with the information already in his possession, then there is no cognizable injury. Id. (citations omitted).

The California Plaintiffs contend that the fact that employees were systematically underpaid as a result of the semi-monthly pay cycle is sufficient, by itself, to constitute injury under the statute.  Under the circumstances presented here, the court disagrees.  Even if the underpayment of wages constituted an injury within the meaning of 226(e), plaintiffs direct the court to no cases drawing that conclusion in the face of undisputed evidence that employees were also systematically overpaid such that, in the end, no net underpayment of wages existed.  *Cf. Adoma v. University of Phoenix, Inc.,* 270 F.R.D. 543, 553 (E. D. Cal. 20*10) (common

issues predominated with respect to itemized wage statement claims where plaintiffs claimed that they were underpaid and prevented from realizing this fact by virtue of inaccurate wage statements).   This case is also distinguishable from (and plaintiffs do not rely on it in any event) *Wang v. Chinese Daily News, Inc*., 435 F. Supp. 2d 1042 (C.D. Cal. 2006), wherein the paystubs stated that the employees worked 86.66 hours regardless of the number of hours actually worked or the number of work days in the pay period and the record reflected an injury in that the plaintiffs were not always paid for overtime work to which they were entitled in light of the "average hours" method of payment.   By contrast, plaintiffs here do not allege that the semi-monthly pay scheme deprived them of overtime pay—they concede that overtime payments were made on subsequent paychecks.

There is also no evidence of any "mathematical injury" to the named plaintiffs or any putative class member.   Juan Franco, one of two California named plaintiffs, testified that "more than half a dozen times" he asked his assistant manager to clarify the "adjustments" on a pay stub.   There is no other evidence in the record as to any injury sustained by Mr. Franco.   Brian Rush testified only that he was sometimes "confused" about adjustments to his paycheck and that on two or three occasions he sought clarification from his manager or assistant manager as to those adjustments.   There is no evidence in the record that any class member—let alone a named plaintiff—was ever forced to engage in discovery and mathematical computations to reconstruct pay or time records in order to ascertain whether he or she had been paid accurately.   Plaintiffs, then, have not demonstrated an actual injury under § 226.

Plaintiffs, relying on *Jaimez v. DAIOHS USA, Inc*., 181 Cal. App. 4th 1286 (Cal. Ct. App. 2010), urge that even if they cannot establish the requisite injury at this stage, certification is

nonetheless appropriate. In *Jaimez*, the Court of Appeal reversed the trial court's order denying certification of a paystub class and, in doing so, stated that the plaintiffs' paystub claims could be certified even though "at this point, there does not appear to be any evidence in the record of . . . injury resulting from inaccurate paystubs." *Id.* at 1306-07. According to the court, "[t]he fact that individualized proof of damages may ultimately be necessary does not mean, however, that Jaimez's theory of recovery is not amenable to class treatment. A common legal issue predominates the claim, and it makes no sense to resolve it in a piecemeal fashion." *Id.* at 1307. That holding, however, merely reflects the standard for class certification under California's Code of Civil Procedure § 382. The court has not uncovered any case applying that aspect of *Jaimez* in the context of a certification motion analyzed under Rule 23.[7] In any event, the issue here is not that the record at this juncture is devoid of evidence of injury, but that the court cannot discern that plaintiffs with the benefit of additional time or discovery will be able at any point to submit evidence of injury in light of the undisputed facts.

For the foregoing reasons, plaintiffs have not persuaded the court that certification under Rule 23 is appropriate for their itemized wage statement claims.

**E.      Vacation Pay Claims**

---

[7]      In *McKenzie v. Federal Express Corp., 275 F.R.D. 290,* 300 n.3 (C.D. Cal. 2011), the court noted in dicta that "even if there was no evidence in the record that McKenzie suffered an injury from the wage statements issued by FedEx . . . the holding in *Jaimez* also supports McKenzie's position that common issues nevertheless predominate in the present action." Because the court found an injury in that case, its extraneous conclusory statement about *Jaimez* is not persuasive.

49

California law requires that California employees be paid for all accrued but unused vacation time upon termination.  Cal. Labor Code § 227.3.  Consistent with California law, the Bank's written policy, applicable to all non-exempt banking center employees, is that an employee is entitled to be paid for accrued but unused vacation days at the time of termination. Prior to July 2011, an employee's manager was required to conduct a manual analysis of how much vacation pay was owed to an employee at the time of termination.  Essentially, the manager reviewed the employee's records to determine how many hours of vacation time the employee had used to that point and how many hours the employee had accrued to that point. The manager then "did the math" to determine the amount of vacation hours owed to the employee and submitted an Earnings Adjustment Form to have that amount paid to the employee.  Beginning in July 2011, the Bank established an automated system for calculating accrued but unused vacation time.  Even under that system, however, an employee's manager is required to check a box to include vacation pay in the final pay check such that if the manager neglects to check the box, vacation pay will not be included in the final pay check.

Based solely on the Bank's records as analyzed by Dr. Shapiro, the California Plaintiffs seek to certify a class alleging violations of California Labor Code § 227.3 in light of the "systemic failure" of the Bank to pay all accrued vacation time earned by its California employees upon termination.  Based upon his review of the Bank's payroll data, Dr. Shapiro opines that 92.15% of terminated employees in California between March 4, 2005 and February 28, 2011 did not receive their full vacation payment at the time of termination.  In light of this deficiency, plaintiffs contend that their vacation pay claims are clearly amenable to class

treatment.   As will be explained, the court disagrees and declines to certify the California Plaintiffs' vacation pay claims.

Those courts that have certified California vacation pay claims have done so in the face of a consistent corporate practice that resulted in the denial of vacation pay to all class members. *See* *Akaosugi v. Benihana Nat. Corp*., 282 F.R.D. 241, 254-55 (N.D. Cal. 2012) (certification of vacation pay claims appropriate where employer implemented "use it or lose it" policy under which an employee forfeited all unused, accrued vacation benefits upon termination; common and predominate issue is whether the uniform policy violated California state law); *Lopez v. G.A.T. Airline Ground Support, Inc*., 2010 WL 3633177, at *4 (S.D. Cal. Sept. 13, 2010) (certification appropriate where employer's policy required forfeiture of vacation benefits if employee leaves the company before his or her one-year anniversary; it can be "easily ascertained" from records which employees were employed less than a year and the amount of unpaid benefits); *Singer v. Becton Dickinson & Co*., 2009 WL 4809646, at *4-5 (S.D. Cal. Dec. 9, 2009) (common question is operation of "use it or lose it" vacation policy; key is identifying a "consistent employer practice that could be a basis for consistent liability"); *In re Wal-Mart Stores, Inc. Wage & Hour Lit*., 2008 WL 413749 (N.D. Cal. Feb. 13, 2008) (certification of vacation pay claims appropriate where computerized payroll system contained inherent lag between recording of service hours and recording of vacation accrual on those hours).

In contrast to these cases, the California Plaintiffs submit no evidence (or even any argument) that the Bank had a consistent corporate practice that operated to deprive them of their rights under California Labor Code § 227.3.  Indeed, the only uniform policy in evidence is the Bank's policy that provides that employees, at the time of termination, are entitled to be paid

for accrued but unused vacation days.   Here, even assuming Dr. Shapiro's analysis is correct,[8] there is no overarching policy or practice resulting in the denial of vacation pay to class members.  In fact, plaintiffs' evidence reveals that an employee might not receive full payment for accrued vacation for a myriad of different reasons.  It may be that an employee's manager did not perform the manual analysis necessary to determine the amount owed and thus never initiated the process for the payment of accrued vacation.  Perhaps the manager initiated the process but got the underlying numbers wrong such that the ultimate calculations were inaccurate.  It may be that the manager got the underlying numbers correct but then performed "bad math" such that the ultimate calculations were inaccurate.  Maybe vacation pay was withheld simply because the manager, despite having performed the correct calculations, neglected to submit an Earnings Adjustment Form.  The point, of course, is that even if the court assumes that violations widely occurred, there is no common evidence tending to show why those violations occurred.  And plaintiffs themselves do not offer any reason or reasons why any particular violations occurred.

The California Plaintiffs direct the court to no case certifying a vacation pay class under similar facts.  The court's own research supports the court's conclusion that certification is not appropriate under these facts.  In *Chavez v. Lumber Liquidators, Inc*., the district court denied certification of California vacation pay claims for lack of commonality and predominance where the plaintiffs did not point to any uniform policy which resulted in the denial of vacation pay and where the employer's express policy provided for payment of accrued unused vacation.

---

[8]    Although the Bank purports to dispute Dr. Shapiro's methodology with respect to his analysis of the vacation pay claims, the majority of the Bank's arguments on this point are not supported by citation to the record.  *See* Bank's SOF ¶¶ 113-114.

2012 WL 1004850, at *9 (N.D. Cal. Mar. 26, 2012).  Like here, the plaintiffs in *Chavez* argued that proof of the vacation pay claims required only an analysis of the employer's records to determine the amount of vacation pay owed to each employee and whether those amounts were in fact paid. *Id.* The district court rejected that argument, finding that the "factual inquiry will be much more complicated than Plaintiffs make it out to be." *Id.* By way of example, the district court noted that the named plaintiff testified that he had "no idea" how much vacation he was owed and he had never tried to calculate the amount. *Id.* The employer's records reflected that the named plaintiff had been paid for his accrued vacation time but plaintiffs argued that the employer's records did not account for all the vacation time accrued by Mr. Chavez. *Id.* Ultimately, the court determined that a "highly individualized inquiry" for each class member would be required to evaluate each class member's claim. *Id.* The record here reflects the same concerns.  Brian Rush, the only named California plaintiff who arguably has a claim for vacation pay,[9] testified that his final paycheck included payment for his accrued, unused vacation.  Plaintiff's expert, however, opines that Mr. Rush was not paid for 30 hours of accrued vacation time.  If plaintiffs themselves cannot agree on whether a particular individual has been paid for his or her accrued vacation time, then the claims clearly are not amenable to class treatment.  For these reasons, the court denies certification of the California Plaintiffs' vacation pay claims.

**F.      Waiting Time Claims**

---

[9]      Mr. Rush is the only named California plaintiff who is a former employee such that he would have been eligible to receive vacation pay in his final paycheck.

The California and Washington Plaintiffs also seek certification of their "waiting time" claims based on state laws requiring employers to pay terminated employees' wages within prescribed timelines. *See* Cal. Labor Code §§ 201-203; Rev. Code Wash. § 49.48.010. The waiting time claims of the Washington Plaintiffs are entirely derivative of their off-the-clock, meal and rest periods, and vacation pay claims. Because the court has denied certification of the underlying claims, it denies certification of the Washington Plaintiffs' waiting time claims as well.

The California Plaintiffs appear to seek certification of waiting time claims based on the withholding of wages related to the underlying claims (the Bank's failure to pay for off-the-clock work and for accrued vacation time) and, apart from those wages, based on the failure of the Bank to issue final paychecks in a timely fashion.[10] To the extent plaintiffs' waiting time claims are derivative of the underlying claims and the Bank's purported failure to pay California employees for the off-the-clock work and accrued vacation, the court denies certification of those claims because it has denied certification of the underlying claims. To the extent plaintiffs' waiting time claims are based on the Bank's failure to timely issue final paychecks to terminated employees in California, the court denies certification because it is undisputed that Brian Rush, the only named California plaintiff who arguably has such a claim, received his final paycheck on the day of his discharge such that he has suffered no injury and the California Plaintiffs do not have a class representative with a claim for waiting time penalties. The court,

---

[10]     In the argument portion of their motion for class certification, the California Plaintiffs do not mention a substantive waiting time claim based on untimely paychecks. Their statements of fact, however, include references to Dr. Shapiro's analysis that nearly 80% of final paychecks issued in California to terminated employees were issued outside the time frame prescribed by California law.

then, denies certification of any substantive California waiting time claims for lack of typicality. *See In re Taco Bell Wage & Hour Actions*, 2011 WL 4479730, at *14 (E.D. Cal. 2011) (denying certification of vacation pay claim where named plaintiffs were not owed any wages for vested accrued vacation and, as a result, there was no typicality or adequate representation for the vacation pay subclass); *Rector v. City & County of Denver*, 348 F.3d 935, 949-50 (10th Cir. 2003) (a prerequisite for certification is that the class representatives be a part of the class and possess the same interest and suffer the same injury as class members).

**G.    Plaintiffs' Remaining Derivative Claims**

Finally, plaintiffs move for certification of additional claims that are entirely derivative of their off-the-clock, meal and rest period, and vacation pay claims.  Specifically, the California Plaintiffs seek certification of their claims under California's Private Attorneys General Act, Cal. Labor Code § 2698 et seq., and their unfair competition claims under California's Unfair Competition Law,  Cal. Bus. & Prof. Code § 17200 et seq.  The Washington Plaintiffs seek certification of their consumer protection claims under the Washington Consumer Protection Act, Rev. Code Wash. §§ 19.86.010 et seq.  Because the court has denied certification of plaintiffs' underlying claims, certification must be denied as to these claims as well.

**VI.    Proposed Notice and Administration Process**

In connection with their motion, plaintiffs have submitted a proposed notice for the court's approval for distribution to members of the conditional class.[11]  The Bank asserts three objections to the notice proposed by plaintiffs—it fails to advise potential opt-ins of the implications of joining the lawsuit, including that they may need to travel to Kansas City for trial or deposition and that they could be required to pay costs if plaintiffs do not prevail; it fails to provide the Bank's counsel's contact information while providing plaintiffs' counsel's contact information on each page of the notice; and it fails meaningfully to describe the Bank's position. The court agrees with the Bank that the notice must inform potential class members that they may be required to travel to Kansas City despite plaintiffs' concerns about a potential chilling effect, particularly in a nationwide collective action that might include plaintiffs from across the country.  Presumably, a potential class member, as part of making an informed decision about whether to join this lawsuit, will want to know that he or she may be required to travel potentially thousands of miles to participate in the action.  The notice already advises potential class members that they "may be required to assist Plaintiffs by providing information, appearing for a deposition, or otherwise participating in the litigation."  Plaintiffs, then, shall replace this sentence in the response to Question 8 of their proposed notice with the following language:  "While this suit is pending, you may be required to submit documents and written answers to questions and to testify under oath at a deposition or hearing, which may take place

---

[11]     Plaintiffs also request that the court order the Bank to provide a computer readable data file containing the names, last known mailing addresses, email addresses, telephone numbers and dates/locations of employment for all potential class members.  With the exception of the request for e-mail addresses (which the court addresses below), the Bank does not object to this request.

in Kansas City, Kansas or Kansas City, Missouri." *See* *Wass v. NPC Int'l, Inc*., 2011 WL 1118774, at \*10 (D. Kan. Mar. 28, 2011).

For similar reasons, the court concludes that full disclosure is required with respect to the possibility that plaintiffs may have to pay costs if they do not prevail in this suit. *See id*. at \*8. Any concerns about a chilling effect are outweighed by the need for potential class members to have the information necessary to make an informed decision about whether to join this lawsuit, particularly where an award of costs to a prevailing defendant in an FLSA case is not merely theoretical. *See id.*  While plaintiffs contend that any language regarding potential costs and expenses is unnecessary because class counsel "will agree to indemnify class members against taxable costs to the full extent permitted by law," the court nonetheless believes that such information is simply part of the entire package of information that potential class members should receive.  Plaintiffs, then, should include any indemnification language in the notice.

The court overrules the Bank's objection to the omission of any contact information for the Bank's counsel, as the Bank's counsel does not "play a role in managing the distribution of the notice or the gathering of consent forms.  Including additional lawyers only creates the potential for confusion of those who receive the notice." *Id*. at \*11 (quotation omitted).  Finally, with respect to the Bank's objection that the notice does not meaningfully describe the Bank's position, the court agrees that the notice does not adequately (or even accurately) assert the Bank's position.  In its present form, the notice, in response to the question "What is the position of the Bank?" states:   "The Bank denies that it has improperly paid current or former employees."  That statement is so broad as to appear meaningless.  The issue is not whether the Bank "improperly paid" its employees but whether the Bank required its employees to work off-

the-clock in the specific ways alleged by plaintiffs.  For whatever reason, however, the Bank has not offered at this juncture any proposed response to Question 4 in the notice.  The Bank simply wants an order directing plaintiffs to insert whatever the Bank prepares, including anticipated information about its defenses and potential counter-claims.  Without seeing the language contemplated by the Bank, it is difficult to resolve this issue.  Nonetheless, the court concludes that the Bank, in the absence of any articulable, specific counterclaim or defense that is reasonably likely to succeed, may not reference any potential defense (other than specific denials of wrongdoing), counterclaim or counterclaim damages in its position of the case. Without a showing that any particular counterclaim or defense has potential merit, the concerns about a chilling effect outweigh the benefit of making a generic reference to counterclaims.  *See Green v. Executive Coach & Carriage*, 2012 WL 4062794, at *3 (D. Nev. Sept. 13, 2012) (in the absence of showing that counterclaims likely to succeed, defendant could not include in notice reference to counterclaims as part of "fair and accurate description" of the case).  As described more fully below, the Bank shall provide to plaintiffs its proposed language and shall ensure that such language is consistent with these admonitions.

With respect to the notice process itself, the Bank asserts additional objections.  To begin, plaintiffs propose a 120-day notice period, arguing that a longer period is necessary and appropriate given that this case involves both an opt-in class and an opt-out class and there is no prejudice to the Bank in giving class members additional time to respond.  Because the court has denied certification of the Rule 23 classes, plaintiffs' first argument is no longer applicable to this case.  Moreover, all parties to this litigation certainly have an interest in moving forward and the 120-day notice period, in the absence of a compelling reason for that length of time,

unnecessarily delays the processing of the case for all parties.  Indeed, the court has only authorized a 120-day notice period on one occasion, where it was undisputed that the class consisted of a large number of non-English- speaking as well as highly transient individuals.  No analogous facts are present here and the court is not persuaded that a 120-day notice period is necessary.  That being said, the court is also not persuaded by the Bank's argument that a 60-day notice period is adequate, particularly when it is highly likely that plaintiffs will need time to repeat their efforts to contact some potential class members.  *See Wass v. NPC Int'l, Inc.*, 2011 WL 1118774, at *11 (D. Kan. Mar. 28, 2011) (referring to 60-day notice period as "unusually short").

The Bank also objects to plaintiffs' proposed notice process to the extent it provides for the mailing of reminder postcards 60 days and 90 days after the initial mailing of the class notice; posting notice at each retail banking center; and utilizing e-mail addresses for purposes of disseminating an electronic notice to class members at either their last known personal e-mail address or their Bank e-mail address.  The Bank asserts that reminder postcards are unnecessary and inappropriate; that posting notice at each banking center is unnecessary and unduly burdensome on the Bank; and that requiring e-mail addresses for notice is both unnecessary and an undue intrusion on the Bank's e-mail system, which is reserved for Bank business.  Plaintiffs, in turn, contend that these processes are directly solely at providing the best notice possible to putative class members , particularly given the large class contemplated by this action.

This court has previously rejected the use of reminder postcards and does so again here.  *See Barnwell v. Corrections Corp. of Am.*, 2008 WL 5157476, at *6 (D. Kan. Dec. 9, 2008).  Plaintiffs have not articulated to the court why the utilization of postcards is necessary and the

size of the class has no bearing on the issue of "reminding" class members to join the litigation. Similarly, in the absence of evidence (or even argument) that plaintiffs anticipate encountering difficulties contacting putative class members, the court is not persuaded at this time that e-mail notification above and beyond written notice mailed to the home addresses of putative class members is necessary.   Finally, as the court explained in *Wass v. NPC Int'l, Inc*., 2011 WL 1118774, at *12 (D. Kan. 2011), it is not persuaded that any benefits from a posting requirement outweigh the burden on the Bank from having to post the notice in more than 5600 banking centers.  This is particularly true where there is no evidence or suggestion that posting will reach a wider audience than mailing and, in fact, the potential class members reached by such posting—current Bank employees—are the same employees for whom the Bank most likely has current home address information.  For the foregoing reasons, the court concludes that mailing, without the use of reminder postcards, provides sufficient notice here and represents the most efficient means of providing notice in this case.

The last issue raised by the Bank is that plaintiffs should be required to use a mutually agreed-upon third-party administrator to process the notice.  Although the issue was not addressed in the proposed notice, plaintiffs clarify in their reply brief that they intend to use a third-party administrator for the notice process, although not a mutually agreed-upon administrator.  While the court has found a handful of cases referencing the production of contact information to a "mutually agreed-upon third-party administrator," none of these cases indicate that the issue was contested.  The court believes that the most reasonable approach is to permit plaintiffs to select a third-party administrator and the Bank may thereafter raise an

objection to that selection if it has a good-faith basis to believe that the administrator selected by plaintiffs might compromise the integrity of the notice process.

No later than October 4, 2012, the Bank shall submit to plaintiffs its proposed language concerning its proposed response to Question 4 of the Notice. Plaintiffs shall then have until October 9, 2012 to submit to the Bank a revised Notice form that incorporates the Bank's language (or objects to that language) and the court's rulings herein. The Bank shall have until October 11, 2012 to review the form and assert any objection that the form does not conform to this order. If any such objection is raised (including any objection to the Bank's proposed language), the parties shall confer, and they should involve the court only if the issue cannot be resolved after good-faith consultation between the parties.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' motion for class and collective action certification of retail banking center employees (doc. 448) is granted in part and denied in part; defendants' sealed objections and motions to strike plaintiffs' manager declarations (doc. 502) are denied as moot; defendants' sealed objections and motions to strike plaintiffs' declarations (doc. 510) are denied as moot; defendants' sealed objections and motion to strike plaintiffs' exhibits (doc. 511) are denied as moot; defendants' sealed objections and motion to strike exhibits (doc. 538) are denied as moot; and defendants' sealed objections and motion to strike evidence (doc. 539) are denied in part and denied as moot in part.

**IT IS FURTHER ORDERED BY THE COURT THAT** the Bank shall provide to plaintiffs, no later than October 11, 2012, a computer-readable data file containing the names,

last known mailing addresses, telephone numbers and dates/locations of employment for all potential class members.  No later than October 4, 2012, the Bank shall initiate the process of revising the notice as described herein.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiffs' counsel shall contact the Magistrate Judge no later than October 4, 2012 to initiate the process of setting up a scheduling conference with respect to the second phase of discovery.

**IT IS SO ORDERED.**

Dated this  27th  day of September, 2012, at Kansas City, Kansas.

_____s/ John W. Lungstrum_____
John W. Lungstrum
United States District Judge